Welcome. Johnston v. Secretary, Florida DOC. We'll hear first from Mr. Hendry. Good afternoon, and may it please the Court. David Hendry from Capital Collateral Regional Council, Tipple Terrace, Florida, for the appellant Ray Lamar Johnston. And we're here today because trial counsel failed to even take the first step to investigate a witness, Diane Bush, who was listed on the state's discovery. Not only was this witness listed on the state's discovery, but when trial counsel Deb Goins, who didn't participate in the actual trial, but she did an early interview of Mr. Johnston at the jail after Mr. Johnston was arrested for this murder. And Deb Goins wrote a series of notes which are contained in about Exhibits 8 to 12 from the evidentiary hearing. And in these notes, Attorney Deb Goins interviewed Mr. Johnston. Let me ask you this. I'm confused about this, and I haven't looked at the state record except what's in the briefs and all, and I see passing references to it that pique my interest about what's in it. Was her deposition taken before the trial or just before the state collateral proceeding? Apparently, both from what was represented by the prosecutor, Jay Pruner. We know that just before her testimony at the evidentiary hearing, I was there. I know that Mr. Pruner requested to take her deposition. Mr. Pruner kept referencing a pretrial deposition that we searched for high and low. We never found it. So Mr. Pruner, with regards to a lot of negative things which were coming out about the sexual relationship and whether it was a threatening sexual relationship between Mr. Johnston and Ms. Bush, but the defense, post-conviction counsel, never saw this deposition. And Mr. Pruner was basically— Yeah, you were post-conviction counsel. Correct. But we don't know whether it was introduced at the trial or not. I mean— It was not a part of the record. We never saw in the state court record this deposition that Mr. Pruner, the prosecutor, kept referring to. But it was, I guess, with quotes around it, it was introduced in part by the questions and answers, I guess. That's correct. Mr. Pruner was at the evidentiary hearing with a series of handwritten notes, and he was questioning Ms. Bush from his handwritten notes about this deposition that apparently was taken prior to trial. Yeah. You know, we can judicially notice parts of the record in state court, but I gather what you're telling me is this deposition was never part of the record in the state court proceeding. That's correct. Okay. That's correct. Was she deposed before the state collateral? She was deposed just before the evidentiary hearing and the state collateral proceeding. Is that deposition in the record? It's—I would assume so. Okay. We'll check. I would assume so. So Ms. Bush was never interviewed, even though she's listed in the state's discovery, and even though Ray Johnston told trial counsel, you need to interview this witness alone because there were a lot of negative things in police reports. And this was because this detective or this officer from the Sheriff's Department went to the hospital to talk to Ms. Bush because Ray Lamar Johnston had been arrested. But just so I understand, you're telling me, as far as you know, no one was present when she was deposed by the state before the trial, the original trial? No one for the defense was present? Well, we saw a complete lack of deposition transcript or deposition notes from defense counsel. We looked at all their trial files and hadn't seen any notes with regards to Ms. Bush. So in Florida, the state can depose somebody before a trial without the defense being there? Only depose? That would be highly unusual. I would think that defense counsel would be there if there was a deposition of Diane Bush. But again, we didn't see a transcript and we didn't see any notes from defense counsel. What we did find are notes from Deb Goins where Ray Johnston said this witness, I saved her life three times. So this is a situation where trial counsel is obviously on notice that there can be some extremely powerful mitigation from this witness. There can be this level of mitigation with regards to Mr. Johnston saving a woman's life is some of the most lofty mitigation that can possibly be presented at a capital trial with Mr. Johnston's life on the line. Not only were there notes from Ms. Goins interviewing Mr. Johnston at the jail, but there was also a letter from Mr. Johnston to the trial counsel. So Mr. Registrata, who actually did the trial, would have read the notes. And again, Mr. Johnston said you need to interview this witness apart alone, apart from law enforcement, apart from the mother. Apparently there was animosity between Ms. Bush's mother and Mr. Johnston. But as far as the failure to investigate, to take the simple step, first step to interview this witness who's listed in the discovery, there was a complete and utter failure on the part of trial counsel. Let me ask you this question. Putting aside the performance deficiency, if he had done a thorough investigation with her, if he had got her away from the mother and if he had got her away from the prosecutor and that sort of thing and found out all there was to find out and had known about the impeachment evidence and the adverse evidence that could have come in, would it, and had made a conscious, and you make a powerful argument that he never made a conscious decision, didn't know about it, and made a conscious strategic decision not to use that evidence because it was too risky, could a reasonable attorney, fully informed, have made a reasonable decision to that effect? Well, what we have to look at is her actual testimony at the evidentiary hearing. And when looking at Ms. Bush's testimony at the evidentiary hearing, there really is not that much negative things from Ms. Bush. Yeah, but there's also testimony of other people, and the police report would have been read to the jury in cross-examination. The nurses could have testified that while she was sedated, he was up on top of the hospital bed on top of her, and at one time there was an emergency and they rushed in there to help her, and he wouldn't get off of her long enough for them to administer medical aid to her and on and on and on. Your Honor, what this brings up is the issue which was found in Sears v. Upton. It's that competent counsel should have been able to turn some of the adverse evidence into a positive. Yeah, but of course there was lesser adverse evidence in that case than there was in this case. I mean, you had a guy who was convicted of three priors, one of which involves rape and sadistic abuse of a woman's hips with a belt she was wearing. And then you had the same thing coming out in Ms. Bush's statement to the detective in which she said that's basically the way he treated her while they were having sex one time, although it wasn't a belt, it was a hand and so forth and so on. What I'm asking you is, could a reasonable attorney, given all of the adverse information that would have been presented to the jury in cross-examination, could he have made a reasonable strategic decision not to go with Ms. Bush as a witness? Well, Your Honor, I agree that there is type of a Jekyll and Hyde element to this case, good versus bad. And what Robert Louis Stevenson was talking about in that case is the duality of human nature, about how there's a good side and a bad side. I understand, and that's an argument for the jury. But what I'm asking you is, could another lawyer who disagreed with you about whether it was worth the risk be reasonable in deciding that it wasn't worth the risk? It's a yes, no, or I don't know question. Well, Your Honor, again, looking at her testimony from the evidentiary hearing, I believe it's been shown from the record in this case that this testimony was positive, that I was able to interview Ms. Bush with my investigators. We were able to present this witness to show that this testimony was very, very beneficial. And most of the negative things that you see there in those police reports, Ms. Bush said, I don't remember that. I don't remember that. And it's likely that she would have testified at trial, had she testified at trial, that she also would have said, I don't recall saying I was frightened of Raylamar Johnston, all the negative things. So, again, Your Honor, Mr. Johnston actually saved a woman's life. And what that would have shown the jury is that Raylamar Johnston's life is worth saving. He has redeemable human qualities. Yes, Raylamar Johnston is a very impulsive individual, and that's what Sears says that trial counsel should do, is even in the light of negative information, you try to turn that into something that's beneficial for the trial, for the trier of fact. And in this case, Your Honor, what we have here is Raylamar Johnston is a very flawed individual, very impulsive individual, but this is a very fatally flawed Florida system. And that's why I tried to keep raising the Caldwell arguments. I realize it's not part of the COA. But in this case, overarching Diane Bush, I believe, is it's not just IAC for failure to call a witness to trial, but this is a trial which has been deemed unconstitutional by the United States Supreme Court. This is a trial where the jury was informed not once, like in Caldwell, where Mr. Caldwell received relief, but 65 times this jury was informed that they were not responsible for making the decision. So as in Caldwell, it says the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others. Did we grant a COA on that issue? You did not, Your Honor. Let's don't talk about it then. Okay.  Trial counsel could have turned any possible negative into a positive. How could he have turned the fact that Mr. Johnston was on top of the heavily sedated Mrs. Bush performing a sexual act on her when the nurses walked in into a positive? I agree. There is a very sensationalistic narrative from law enforcement. They went there to the hospital room not to gather mitigation from Mr. Johnston, but to obtain as much negative information. I'm sorry. Do you deny that that happened? Is that your position? It just didn't happen and we're just going to go on with our position as though it didn't happen? It wasn't investigated. I never saw a deposition of this nurse. Assuming it happened, you like Sears, with the Sears background, turn that into something positive. I don't know about positive, Your Honor, but it says that trial counsel can turn this into perhaps something in support of a cognitive deficiency mitigation theory. There was a PET scale in this case. It's so wrong that it must indicate he's got mental problems and therefore you shouldn't give a death sentence. I'm trying to understand. I understand, well, there were things that she could have testified to that were good, but that's not the State's case. The State doesn't deny she could have testified to non-statutory mitigating circumstances. Their case, as I understand it, is there's so much bad that would have come in that a reasonable attorney would have said, as this reasonable trial counsel said when he was presented with all this, that would have been very bad for us. In effect, I wouldn't have used it even if I'd known all of that. It seems to me that given that statement, we know the State courts credited his testimony as true and accurate. We know that if he had been fully informed of all this evidence, he would not have used it. There's not a reasonable probability of a different result if he would not have used it. Now, the counter to that may be, well, it would have been ineffective assistance of counsel for him not to use it. I understand that, but it seems to me like given the fact they've credited his testimony that he wouldn't have used it, you've got to convince us that every reasonable attorney would have used that testimony, even being fully aware of the bad evidence that would have come in. Don't you? Well, we presented it, Your Honor, at the post-conviction evidentiary hearing. I think the evidence, I think the record speaks for itself that on balance, this is a very positive witness. This is a witness who credits Ray Lamar Johnston with saving her life. There was an aggravator presented by the State and it's pecuniary gain. If you look at this evidence, which shows Ray Lamar Johnston could have just taken $10,000 just a few months before this murder. Did he actually, was this crime committed for pecuniary gain? There's a question as to that. I don't understand your argument about that, the guilt stage argument on the $10,000 cash. The State didn't say he kidnapped, raped, and abused the victim in this case because he always does that to women who have any cash or any way of giving him money. They used a financial motive and, in fact, he used her ATM card to get $1,000 in cash. But I don't understand your syllogism. He didn't steal the $10,000 60 days earlier and, therefore, he couldn't have committed this crime or unlikely to have committed this crime for money. These are two different situations. The three priors that he was convicted of were all women who were strangers to him. He didn't kidnap, abuse, and rape or otherwise women who he knew. In fact, there's no way he could have stolen that $10,000 without getting caught and punished for it, is there? I mean, Ms. Bush knew he was going to her house. She sent him there to get the $10,000. She sent him there with her neighbor. He steals the $10,000. She tells the police. If he steals the $10,000 and kills the neighbor so she won't tell on him, Ms. Bush tells the police. I don't understand how the fact that he didn't steal the $10,000 makes it less likely that his kidnapping of the victim, in this case, was at least in part for pecuniary gain. Your Honor, the whole time Ray Lamar Johnson had access to her credit cards, her debit cards, her car, all these things of value and ultimately the $10,000 at the house. Again, this is evidence which could have been presented to the trier of fact that he was nothing, as Ms. Bush said, but a loving, caring individual. She said at the evidentiary hearing she never felt threatened by Ray Lamar Johnson. So trial counsel had a duty to refute this aggravator, pecuniary gain. It would have had to be improved beyond a reasonable doubt that Ray Lamar Johnson committed this crime for pecuniary gain. I'm sorry. Didn't she acknowledge when talking about perfect gentlemen, and she did say that. I wrote him a letter later. But didn't she acknowledge that he had mistreated her during sex in a sadistic way, but she just assumed that all gentlemen behave that way? Well, again, Your Honor, this was Mr. Pruner, the prosecutor, and he had these notes. We don't have an actual deposition transcript. But ultimately at the evidentiary hearing, Ms. Bush said, I just want to say that she finds this to sometimes be the norm with certain gentlemen. And I got her to affirm that she never felt threatened. So what the prosecutor, this was the prosecutor's theory. This was not trial counsel's theory. The prosecutor had a theory that this is going to be negative information because it's going to be like, look, Ray Lamar Johnson was trying to kill this woman, but he was never trying to kill her. I want to talk about basically my burden in this case because at this point in Florida, now it has to be unanimous, so just one juror. So the standard has become since I filed my appeal in this case, at that time I would have to show in this 12-0 advisory recommendation that there would have to be at least six jurors, six advisory panel members who would change their mind. In this case, the burden is only one. Had this testimony affected just one of these advisory panel members, Ray Lamar Johnson gets relief. So now it was deemed to be a harmless error by the state court. But the argument now is that because we only have to show a change of opinion of one of these advisory panel members rather than six, our burden becomes that much more lessened. The state has a burden here to show that this wouldn't have made a change of opinion, just one juror. And what we're talking about is . . . Is the theory that if you get 12 people, you're going to have one who's more likely to side with the defendant or be affected by this kind of argument? That is, at this point, if this testimony that Mr. Johnson saved this woman's life would have affected just one of these members, then he would have obtained relief. And if that one member by her or him being affected and the other 11 doesn't, that one member would be different from, a variation from the other 11, right? Right. I thought the Supreme Court had told us repeatedly that when you're applying the reasonable probability of a different result to a jury situation, it's an objective standard and you're not supposed to take into account idiosyncratic jurors. Am I wrong? I . . . well, I mean, just because there would be a juror who's going to side with life over death doesn't make them all that peculiar, Your Honor. What we're talking about under Strickland is whether we have confidence in the outcome of the results of the proceedings. And so basically, if one juror comes to the conclusion that Mr. Johnson's life is worth saving, has some redeemable qualities, then Mr. Johnson would have obtained, if this would have been an 11 to 1 case, Mr. Johnson would have received hearse relief because this happened after the Ring decision in 2002, the case was final. But there is . . . we would agree that there is a possibility, there is this two-edged sword of some negative damaging information coming in to trial with the presentation of this evidence. But this is a . . . Ray Lamar Johnston, there was a PET scan presented at trial, and this shows that his frontal lobes are so damaged that he has extreme difficulty in controlling his impulses. So all these acts, which are detailed in the police reports from a law enforcement officer who went there with the mission to get incriminating evidence against Ray Lamar Johnston, it was trial counsel's duty to look at that evidence and do separate interviews and try to come up with beneficial mitigating information that was connected with Diane Bush. And we stand on the record that was presented at the evidentiary hearing that this was largely positive. And Ms. Bush did not affirm all these negative things which were detailed in the police reports. And if trial counsel had just taken that first step in investigating, he could have presented this testimony to the court. And I want to bring up . . . I can't show you an actual case law which says that, okay, trial counsel was ineffective for failing to present evidence that the defendant might have saved someone's life. I don't have that case law for you, but there was a case out in Colorado. I talked to a colleague in preparation for this oral argument, and the case was Sablan, S-A-B-L-A-N. And in that case, this was a prison cell. This was a case where a prisoner was disemboweled, and the entrails were basically strewn all across the cell doors. Very gruesome, very disturbing case. In that case, the jury came up with life. There was at least one juror who said, you know, the mitigating evidence that this defendant in this jail cell who committed this horrible, horrible crime sided with life over death because it included mitigating evidence that these cellmates, the defendants, had saved someone's life. Trial counsel called someone from Guam, an associate from Guam, and this person said, yeah, we were out in a boat, and the waves were so high, and the boat capsized. Three people died. I survived. I credit this defendant in Colorado with saving my life, and it so affected the judgment of the jury who sat to deliberate his fate that they came up with a life sentence. This is not that particular gruesome, grotesque crime here in this particular case. So, and this is a federal case out of the 11th Circuit, so I see I'm down to two minutes, but I just want to say that it can't get very much more mitigating in a case of life or death to present evidence that the defendant saved someone's life, and that's what Diane Bush told us at the evidentiary hearing, that she credits him saving her life, and it just doesn't get any more mitigating. The state courts unreasonably discounted this very, very powerful mitigation, and I know that I have a very high burden, but under Miller L. Cockrell, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not, by definition, preclude relief, and it is a high burden that we have. We have to show that not just the decisions were wrong, but they were unreasonable, and I think this court doesn't have to go very far to say this is absolutely deficient performance. The state courts were not even willing to go that small step to say that there was deficient performance. There was absolutely deficient performance in failing to investigate this. Yes, there are a lot of negatives, but we feel that the positives far, far outweigh the negatives, and had trial counsel done what post-conviction counsel did, which is to fully investigate these whole scenarios, all this negative information, they could have turned this into a positive. Diane Bush, again, likely would have not affirmed at trial all the negative things contained in these police reports. Now, Ms. Bush's family was there in the hospital room. Mr. Raylord Johnson, he was basically your outsider, and I think what you have here is the family felt that the providence of their familial duties to protect Diane Bush, they felt like, who is this outsider and who is this man, and they were so ready, especially when the TV came on and he was shown to be withdrawing money from Leanne Coriell's account. But Raylord Johnson, once he was on television, became absolutely public enemy number one. It was trial counsel's duty to investigate and find mitigating evidence. They failed to do so. Raylord Johnson was prejudiced, and the decisions of all the lower courts are unreasonable. And I will reserve my time. Thank you. Let me ask you one thing. The way I read the Florida Supreme Court's opinion in the State Collateral Appeal, it affirmed the denial of relief on the penalty stage claim, as I read it, on lack of prejudice grounds. Am I wrong about that? You have a different opinion. The Florida Supreme Court? Yes. Correct. Lack of prejudice. Okay. And that was as to the – they didn't mention the $10,000. That was as to the penalty stage, I gather. Right. They just mentioned the mitigating aspects of the saving of the life. But, yes, the Florida Supreme Court, very, very short paragraph denying both guilt phase and penalty phase claim, but there's not even one mention of the $10,000, and we feel that that works in our favor, that this was an unreasonable decision. They unreasonably discounted the mitigation in this case, and they didn't do a very careful review of our claims. So you view that as a denial of both claims on prejudice grounds, on lack of prejudice grounds? We would assume that, yes, Your Honor. Okay. All right. Thank you. Thank you. You've got your full five on reply. Mr. Freeland? Thank you, Your Honor. Good afternoon. Timothy Freeland here on behalf of the State of Florida. Could you help us out a little bit on her, on Ms. Bush's pretrial deposition? I cannot. We don't see it in the record. As far as you know, it's not there. I wish that I had access to it. As far as I know, it's not there. Okay. I think clearly there was reference to it during the post-conviction hearing. And there's no indication anywhere of whether the defense was present during it or anything? Having not seen the deposition, I can't speak to that. No, I mean during the state collateral, was there any reference anywhere as to whether the defense was present? It seems strange to me if the defense was present. Somebody wouldn't have pointed that out because trial counsel at that time was questioned fairly extensively about what you know about this witness, what do you mean you've never heard of her, and so forth and so on. If he had been there, we would have known that, wouldn't we? I have no evidence that there was a deposition taken of Ms. Bush prior to trial. And of course, she says there wasn't, that she doesn't have any memory of it. Correct. She has no recollection of that either. So I can only conclude that the only evidence that they have of what happened with Ms. Bush before trial would have been what law enforcement did in terms of approaching her during their investigation of the case. That's Taylor's notes. That's correct. Detective Taylor's interview. Somebody was calling Taylor's notes a deposition? Somebody learned it in the law was doing that? I haven't seen the deposition, Your Honor. So, I mean, what... It may just be that it doesn't exist. That's what I'm thinking. A pretrial deposition, in my opinion, I haven't seen it. I don't believe it exists. If certainly it is not the practice in Florida for the state to have private depositions, we wouldn't call it a deposition in that case. We would say we interviewed this witness who was a state's witness. Now, that's the way we do things. If we're going to have a deposition, we invite the defense to participate, and they can cross-examine or whatever they want to do. But I don't see that that's what happened here. Thank you. It's apparent that there was some sort of deposition which probably occurred, again, I'm speculating, but it probably occurred in the course of investigating the post-conviction. Okay. Now, is that one in the record? I haven't seen it. Okay. So, okay. That's what I thought. So, as far as... But you have... You sound like you feel like maybe there actually was a deposition. Only because Prosecutor Pruner referenced it in that way, that there was a deposition. But as far as what we know about that deposition, all we have is him, the prosecutor, reading from his own notes. Correct. And the testimony from Ms. Bush was, well, I don't remember that either. Right? Well, that's correct. But I would think that at that time, if Mr. Pruner was reading from notes from a nonexistent deposition, this would have invited an objection from opposing counsel saying, hey, we were never at any deposition, there was no deposition. But nothing of that sort happened. So, I mean, again, we're kind of... We're left to speculate. We're kind of speculating. But the record says, Mr. Pruner said, at a deposition. So, that's... I can't go any further than that. Okay. I'm just glad to know. We looked for any deposition and found none. So, that's consistent with your understanding of the record. Yes. I would love to be able to read from that deposition to the court because clearly it had some interesting things. So, let's talk about the guilt phase. And I know that the Florida Supreme Court did not address the guilt phase. And I think then we have to look at what the post-conviction court did. I understand your brother over here to say that they denied the guilt stage claim on prejudice, just like they did the Senate stage. Correct. Right. And the reason for that is that, and the court is familiar with the record, but I'll just remind the court of what the post-conviction court said. The guilt phase, the only way that Diane Bush would have been helpful in guilt phase would have been to dispute or call into question the evidence of motive, the financial motive, which was one of the two reasons that the prosecution used as the reason why this attack occurred. And the trial court, I'm sorry, the post-conviction court found that because of the two-month disparity between when this $10,000 event occurred and when the murder of Ms. Coryell occurred, that there just wasn't any relationship between them sufficient to call into question the fact that he could have allegedly stolen this $10,000 but didn't. I'm unclear on your answer. I thought you said that the Florida Supreme Court didn't address the guilt stage ineffective assistance claim. They did not. And then I ask you, but your brother over here says they denied both claims for lack of prejudice, and you said, yes, that's right. Those two statements, as I heard them, and I may have misheard them, are inconsistent. What I'm trying to get at is that the Florida Supreme Court did not specifically address the $10,000 claim. Which is the guilt stage claim. Correct. Okay. All right. And since they did not address the $10,000 claim, we then turn to the next reasoned decision, which was post-conviction court's ruling that that $10,000 claim would not have helped the defendant in his guilt phase because the two just don't, the timing is off, the two don't correlate. Even if the defense had brought in the fact that, well, he had an opportunity to steal this $10,000 but did not, it fails to address the sexual component of the alternative motive that the State presented at the trial. We have to also look to the factual findings of the trial court with regard to whether counsel was even asked to call Diane Bush as a witness. Significant to this argument is the trial court's finding of credibility. What difference does it make whether they were asked if they knew about her and should have called her? Well, it goes to the first prong of Strickland. No, but Strickland, independent upon the instructions from, I know instructions from the client are relevant, particularly if it says don't call mama. But what I'm talking about is it's not particularly relevant that the defendant doesn't say call this witness or not call this witness. Other than if he says call this witness, you need to ask him why and check into it. Am I wrong about that? I thought counsel had an independent duty to investigate. Well, counsel, certainly counsel does have an independent duty to investigate, but part of their claim was that. I know they put that in there and, you know, you can overplead anything, but I'm not sure they have to prove it. All right then. So let's talk about, I mean, the prejudice aspect when we're talking about guilt phase. I mean, there isn't, clearly, when we're talking about prejudice, there is no prejudice. I think that's a stronger argument for you than the deficient performance issue. And just to follow up on that, I mean, there were, and this is another record question, I guess, but there were notes with Ms. Bush's name in it and her telephone number. I have them here. So that was a yes? Correct. That's true. Okay, thanks. Yeah, there is, and that indicates that the defendant was given, again, it looks to me like what those notes come from is that the defendant was given a list of witnesses, these are the State's witnesses, and, you know, the State, in a homicide case, might list 100 witnesses. And if you go through the notes in detail, he lists, he talks about many, many, many witnesses, including Diane Bush, and it appears to be, I think the trial court interpreted it this way, that counsel, defense counsel said to him here, here's a list of witnesses the State intends to use, give us your notes on what you want us to do about these witnesses and how we can address them. So he does talk about Diane Bush. He talks about how you should interview her, and he also talks about many other witnesses on, you know, here's what you can talk about with this witness. In fact, there was another witness who talked about he, Mrs. LaBarbera, for example. This is on page 5438 of the post-conviction record. He talks about her, how he helped her out, how he took her child to the hospital, how he went to the Strawberry Festival, which is a fair in Plant City that they have in February. So there's a number of other witnesses in here that he also talks about. And as far as we know, there's been no complaint that none of those witnesses were called. So in terms of prejudice and guilt phase, there really, there isn't any, and the Florida Supreme Court correctly rejected relief as to that. So let's turn to the penalty phase issues now. This witness, Diane Bush, was fraught with risk if they attempted to bring her in as a penalty phase witness to assist. The court knows what her testimony would have been. This man helped me in a crisis, and he saved my life. And this is what she testified to at the post-conviction hearing. The notes of the Detective Taylor of her interview with Ms. Bush two days after, well, sometime after the murder of Leon Coriel conflict significantly with her statement at the post-conviction hearing. Also, Diane Bush is the one that turned him in. This is the man who she later claims saved his life. But as soon as she saw his picture up on the news saying we're looking for this man, she recognized him and she called the Crime Stopper's phone number to turn him in. This does not sound like someone who is grateful for this man who saved my life. I would suggest that maybe she had, over time, she may have had a change of heart. But at the time of the trial, we have to go with what Detective Taylor, her interview. Did she deny making any of the statements in the detective's reports? No, sir. She just said, I don't remember some of them. That's correct. I don't remember saying that. And with regard to the prosecutor's suggestion that she had been involved and experienced an unusual sexual encounter with a defendant, it's interesting that she said, I don't remember that. And then subsequently, during the same hearing, she said, if that happened, that's not that unusual. So it seems like there's some waffling on that issue as well. She said, you know, I sit here in reflection of the encounter that I had with Mr. Johnson 10 years ago sexually to this day. That encounter is not unusual. I feel it's kind of the norm of a lot of gentlemen. So I just wanted to add that. Right. That's the statement I'm talking about. It seems like initially she said, I don't remember that ever happening, but then later maybe she does remember that ever happening. And that's exactly the statement I'm talking about. Now, if we're talking about penalty phase, we have to look at, I'm looking at the sentencing order that, you know, the death sentencing order from the trial court. Prejudice in the penalty phase was not established. I mean, there was no prejudice to the defendant. We note here that there were four aggravators that were established here. One of them, that the defendant was previously convicted of a felony, multiple felonies. The trial court, and I'm reading from the court's sentencing order, the facts of those prior violent felonies are chillingly similar to one another and to the case at bar. The defendant's modus operandi was to covertly approach women as they exited their cars near their residences, swiftly overpowering them and the victim, and transport the victim to an isolated area before assaulting and humiliating her. That is very, very similar to what happened here. There were three other aggravators, so the substantial aggravators, including the heinous, atrocious, and cruel aggravator, which we know that the medical examiner testified that Mr. Johnston strangled this woman to death after engaging in what is clearly a humiliating act. She was found nude. She was beaten. There was bruising on her buttocks, which matched up with the belt buckle, and that had to have happened while she was alive because we know bruising doesn't occur after death. He strangled her, and the evidence shows that she had strands of hair, strands of grass in one of her hands, which this is the last thing that she did before she died. Heinous, atrocious, and cruel, yes. In addition, you know, talking about the mitigation that was presented, this is not one of those cases like in Williams or Wiggins or even Sears where there was a whole lot of other mitigation that he could have investigated but he didn't present. They established one of the state's statutory mitigators, and that's pretty strong. I mean, that's pretty good if you're able to do that as a defense. They put on four different medical experts who testified in support of mitigation, and the trial court found that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, and the court gave that moderate weight. In addition to that, there were 26 other mitigators that the defense attempted to establish. They attempted to do this by presenting testimony of the victim's family, I mean the defendant's family, his mother, his sister, his ex-wife, all of whom testified in his favor, his probation officer, officers from incidents where he was in prison before his pastor came and testified in his support. Significantly, the evidence that Diane Bush would have presented, that he was a loving person, that he helped her in a time of crisis, we know that there is some risk involved in that because of these other negative things. But the defendant's ex-wife testified to fundamentally the same thing, and the trial court found that that had been established and gave it slight weight. So when we compare what the risk of putting Diane Bush in as a witness, there really doesn't seem to be a good reason to do that, particularly when we have a wealth of other mitigation. It doesn't seem likely, and the Florida Supreme Court, its ruling on this was reasonable, a reasonable application of Strickland. It doesn't seem likely that if they had put in Diane Bush as a mitigating witness, that there would have been any change in the outcome of this case. If the Court has no further questions, that's the extent of my argument. We don't. Thank you, Counsel. Thank you. Mr. Hendry, I wonder if you could, it's not directly at the heart of the relevance, but I didn't understand the testimony he gave at trial, which he's now admitted is false, but at the guilt stage. I'm sorry, at the sentence stage. He said it was an accident, you know, didn't mean to kill her, reached to grab her shoulder and ended up grabbing her neck, etc. Thinking he had broken her neck, Johnson put her in the back seat of her car and drove her to church. This is from the Florida Supreme Court summary of his testimony. To make it look like she had been assaulted, Johnson took off her clothes, scattered them about, kicked her in the crotch, beat her with a belt and dragged her to the pond. What was the theory, and I haven't read the cross-examination of that because it's been superseded by his penalty stage testimony, but why did he want to make it look like she had been assaulted instead of accidentally killed? That's very perplexing to me, Your Honor. I think it goes back to the very impulsive nature of Ray Lamar Johnson, shown with a PET scan. This man, in his testimony, he's impulsive. Okay. Bringing that up, I'm glad you brought that up because I want to point out that trial counsel, there was a problem. There was real question whether they were going to call Mr. Johnson. And we had testimony from Gerard Hooper, who was called from a seminar, and he testified at the evidentiary hearing. I said, go ahead and put him up on the stand, basically to show remorse. Well, there was a very, there was a dichotomy of testimony from Mr. Registrato and Mr. Litman when they said, we did not want him to testify. That's the last thing we wanted to do. So you have trial counsel here. There's a real disagreement about whether there was a decision to let him testify or not testify. Speaking of his testimony, I want to say that instead of presenting Ray Lamar Johnson, which we had a claim that he should not have been presented, his testimony was absolutely awful. Take that out of the equation. Instead of putting up Ray Lamar Johnson, let's say they investigated Diane Bush, presented her testimony. I would say that there would be a reasonable probability that at least one juror is going to vote for life over death if you take out Ray Johnson and introduce Diane Bush. Basically, the purpose of Ray Lamar Johnson's testimony was obviously to show that he had some kind of remorse. It did not come through. It was awful. It was a surreal experience in the courtroom. I wasn't there, but I read the transcript. And Ray Lamar Johnson, from the stand, looks out to the victim's mother and says, I'm horribly sorry that Leanne's dead. Jay Pruner stands up and says, he is not to address anyone in the audience or the family. And the judge said basically sustained. So this was a crazy situation. Of course, the issue before us is not whether if they had not called him but had called Bush. The question is whether if they had called Bush. And I'm suggesting that if you present the testimony of Diane Bush, you don't need to grapple with the issue of should we present Ray Lamar Johnson's testimony. It should not have been presented. I want to talk about briefly, because there was a question about the evidence and whether it should have been presented and knowledge of trial counsel. But in Rompilla, the courts basically said all you need to do is open the court file to find mitigating information. All trial counsel had to do was look at the discovery. Look at the notes from Ray Lamar Johnson in Exhibit 14 where he said a lot of history here. She needs to be interviewed by herself with no one else in the room. She will tell the truth. I stayed with her for 15 days and nights and saved her life three times. So this is not a situation, this is the complete opposite of the situation, where the defendant may have thwarted the investigation of mitigating evidence. Ray Lamar Johnson was trying to enhance the investigation. Trial counsel failed to follow up on their duties. Why didn't he testify to that himself? That's a good question, Your Honor. I can't answer that. Bad character evidence shouldn't come into a penalty phase, and a lot of this information is bad character evidence. It was interesting with Jay Pruner when he was reading from his notes and saying he beat you, he called you names, he threatened you, et cetera, et cetera. And then when Ms. Bush said, you know, this is the norm, Jay Pruner stood up and said, this would never see the light of day at a trial. Well, we would suggest that Jay Pruner's notes, which documented this alleged frightening situation, should never see the light of day in a penalty phase. There's an unreasonable finding in the state courts that, well, I think deficient performance is clear, but if a defendant were to say the police burst into my house and took this evidence, the defendant doesn't need to say, you need to file a motion to suppress. Trial counsel needs to know, as reasonable counsel, file a motion to suppress. There's a lot of post hoc rationalization here. It's all in the record, primarily from Joe Restrato. I just want to close respectfully, respectfully, Your Honor, that there has been 34 years of sustained Caldwell violations in the state of Florida, and this is so unreasonable in a capital case. Thank you, Mr. Hendry. We'll take that case under submission. All rise.